1  ROBERT P. VARIAN (STATE BAR NO. 107459)
   rvarian@orrick.com
2  M. TODD SCOTT (STATE BAR NO. 226885)
   tscott@orrick.com
3  ALEX TALARIDES (STATE BAR NO. 268068)
   atalarides@orrick.com
4  JASON CABOT (STATE BAR NO. 288877)
   jcabot@orrick.com
5  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
6  405 Howard Street
   San Francisco, California  94105-2669
7  Telephone:    +1-415-773-5700
   Facsimile:    +1-415-773-5759
8
   Attorneys for Petitioner
9  23andMe, Inc.

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13

14  23ANDME, INC.,                        Case No. 3:15-CV-1323

15                  Petitioner,           **PETITIONER 23ANDME, INC.'S
                                          PETITION TO VACATE
16         v.                             ARBITRATION PARTIAL AWARD
                                          AND MEMORANDUM OF POINTS
17  KAREN DAVIS-HUDSON and SARAH          AND AUTHORITIES IN SUPPORT**
    DIAZ,

18                  Respondents.

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .............................................................................................. 1

II.   FACTUAL BACKGROUND .......................................................................... 4

    A.    23andMe ............................................................................................... 4
    B.    The Arbitration Agreement .................................................................. 4
    C.    The November 22, 2013 FDA Letter .................................................. 5
    D.    The Arbitration Claims Based On The FDA Letter ............................ 5
    E.    The Clause Construction Adjudications .............................................. 6
    F.    The Superior Court Action .................................................................. 8

III.  ARGUMENT .................................................................................................. 9

    A.    The Re-Adjudication Violates The Requirements Of The FAA ........ 10

        1.    The Re-Adjudication Is The Antithesis Of A "Streamlined
             Proceeding" ................................................................................ 11
        2.    The Process Adopted And Enforced Via Re-Adjudication
             Contravenes The Intention Of The Parties ................................ 12
        3.    The Process Adopted In The Re-Adjudication Does Not Ensure
             That The Arbitration Agreement Will Be Enforced According To
             Its Terms .................................................................................... 13
        4.    The Process Adopted In The Re-Adjudication Effectively Requires
             The Availability Of Class Arbitration ....................................... 13
        5.    The Re-Adjudication Contravenes Section 10(a)(4) Of The FAA ........... 13

    B.    The Court Can Determine Which Award Governs ............................. 14
    C.    This Court Can Also Defer To The Determination To Be Made In The San
       Francisco Superior Court Action ........................................................ 16
    D.    The Arbitrator's Award Is Completely Irrational And Exhibits A Manifest
       Disregard Of Controlling Law ............................................................ 16

        1.    No Rational Interpretation of Controlling Case Law Could Possibly
             Justify The Arbitrator's Award ................................................. 18
        2.    The "Rationale" Of The Arbitrator's Award Underscores The
             Reasons It Must Be Vacated ...................................................... 20

IV.   CONCLUSION .............................................................................................. 25

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Page(s)**

3

**Cases**

4

*Arroyo v. Riverside Auto Holdings,*
    2013 WL 4997488 (Cal. Ct. App. Sept. 13, 2013) ..........................................................18, 24

5

6

*AT&T Mobility LLC v. Concepcion,*
    131 S. Ct. 1740 (2011) ............................................................................................... 10-13

7

*Beeman v. Anthem Prescription Mgmt., LLC,*
    689 F.3d 1002 (9th Cir. 2012).........................................................................................18

8

9

*Chico v. Hilton Worldwide, Inc.,*
    2014 WL 5088240 (C.D. Cal. Oct. 7, 2014) ............................................................ 18- 20

10

*Comedy Club, Inc. v. Improv W. Associates,*
    553 F.3d 1277 (9th Cir. 2009)....................................................................................16-17

11

12

*Connecticut Light & Power Co. v. Local 420, Int'l Brotherhood of Electrical*
    *Workers, AFL-CIO,*
    718 F.2d 14 (2d Cir. 1983).........................................................................................15-16

13

14

*Emps. Ins. of Wausau v. Granite State Ins. Co.,*
    330 F.3d 1214 (9th Cir. 2003)..........................................................................................18

15

16

*Freightliner, LLC v. Teamsters Local 305,*
    336 F. Supp. 2d 1118 (D. Or. 2004) ................................................................................17

17

18

*Garden Fresh Rest. Corp. v. Superior Ct.,*
    231 Cal. App. 4th 678 (2014)...................................................................................... 8- 11

19

20

*Iskanian v. CLS Transportation L.A. LLC,*
    59 Cal. 4th 348 (2014) ....................................................................................................10

21

*Johnson v. Wells Fargo Home Mortg., Inc.,*
    635 F.3d 401 (9th Cir. 2011)............................................................................................16

22

23

*Kinecta Alternative Fin. Solutions, Inc. v. Super. Ct.,*
    205 Cal. App. 4th 506 (2012)...................................................................................*passim*

24

25

*Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett,*
    734 F.3d 594 (6th Cir. 2013), *cert. denied,* 134 S. Ct. 2291 (2014) .............................11

26

*Lopez v. Ace Cash Express, Inc.,*
    2012 WL 1655720 (C.D. Cal. May 4, 2012) ...................................................................18

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP

ii

*McElroy v. Tenet Health Care Corp.*,
  2013 WL 4482928 (Cal. Ct. App. Aug. 21, 2013)...........................................................18, 20

*Mitsubishi Motors Corp. v. Soler Chrystler-Plymouth, Inc.*,
  473 U.S. 614 (2008) ............................................................................................................10, 12

*Mortensen v. Bresnan Commc'ns, LLC*,
  722 F.3d 1151 (9th Cir. 2013).............................................................................................10, 13

*Nelsen v. Legacy Partners Residential, Inc.*,
  207 Cal. App. 4th 1115 (2012)............................................................................................ 18- 22

*Network Capital Funding Corp. v. Papke*,
  178 Cal. Rptr. 3d 658 (2014), *review granted on other grounds by* 340 P.3d
  1043 (Cal. 2015) ............................................................................................................ 18, 21- 23

*Opalinski v. Robert Half Int'l Inc.*,
  761 F.3d 326 (3d Cir. 2014), *cert. denied*, 2015 WL 998611 (U.S. Mar. 9,
  2015) ...........................................................................................................................................11

*Pearson Dental Supplies, Inc. v. Super. Ct.*,
  48 Cal. 4th 665 (2010) ...............................................................................................................17

*Preston v. Ferrer*,
  552 U.S. 346 (2008) ....................................................................................................................10

*Ramos v. Fry's Elecs., Inc.*,
  2014 WL 6269307 (Cal. Ct. App. Nov. 17, 2014).................................................................18, 24

*Reyes v. Liberman Broad., Inc.*,
  208 Cal. App. 4th 1537 (2012), *review granted on other grounds and then
  dismissed in light of Iskanian*, 59 Cal. 4th 348 (2014) .................................................18, 20, 23

*Rivera v. Hilton Worldwide, Inc.*,
  2013 WL 6230604 (Cal. Ct. App. Nov. 26, 2013)...........................................................18, 20, 24

*Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*,
  559 U.S. 662 (2010) ........................................................................................................... passim

*Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*,
  548 F.3d 85 (2d Cir. 2008), *rev'd on other grounds*, 559 U.S. 662 (2010) ............................17

*Todd Shipyards Corp. v. Cunard Line, Ltd.*,
  943 F.2d 1056 (9th Cir. 1991).....................................................................................................17

*Trailways Lines, Inc. v. Trailways Inc. Joint Council*,
  807 F.2d 1416 (8th Cir. 1986).....................................................................................................15

ORRICK, HERRINGTON &
SUTCLIFFE LLP

*Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
    489 U.S. 468 (1989).................................................................................13

*Whalley v. The Wet Seal, Inc.*,
    2013 WL 6057679 (Cal. Ct. App. Nov. 15, 2013)...........................................18-22

**Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ........................................................ *passim*

## PETITION TO VACATE ARBITRATION PARTIAL AWARD

Petitioner 23andMe, Inc. ("23andMe") hereby moves the Court, pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, to vacate the Partial Final Clause Construction Award, issued by Arbitrator Robert L. Brent in an arbitration administered by the American Arbitration Association ("AAA") (AAA No. 74-20-1400-0032) and filed on December 23, 2014, in which Respondents Karen Davis-Hudson and Sarah Diaz were the claimants and 23andMe was the respondent.  Ex. A.[1]  Pursuant to 9 U.S.C. § 6, this Petition is being made in the manner provided by law for the making and hearing of motions.  This Petition is based on the supporting memorandum of points and authorities; the accompanying Declaration of Jason G. Cabot, and the arguments of counsel.

## JURISDICTION

Petitioner 23andMe, Inc. is a Delaware Corporation, with its principal place of business located at 1390 Shorebird Way, Mountain View, California 94043.  Respondent Karen Davis-Hudson is an individual, residing in Birmingham, Alabama.  Respondent Sarah Diaz is an individual, residing in Weston, Florida.  The amount in controversy exceeds $75,000.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  Venue properly lies in this Court pursuant to 9 U.S.C. § 10(a) as the Partial Arbitration Award that is the subject of this Petition was made in this district.

## INTRADISTRICT ASSIGNMENT

Pursuant to Local Rules 3-2(c) and 3-5(b), a substantial part of the events giving rise to this Petition occurred in San Francisco County.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

The issues presented on this motion differ from those normally presented on a motion to vacate because the arbitration award in question re-determined a pivotal threshold issue that had just been adjudicated in the same controversy.  Because the doctrine of *stare decisis* does not apply to arbitration awards, in normal circumstances the fact that a second award is inconsistent

---

[1] All exhibits are attached to the Declaration of Jason G. Cabot in support of this Petition.

1

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW

PETITIONER 23ANDME, INC.'S PETITION TO VACATE ARBITRATION PARTIAL AWARD
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - CASE NO. 3:15-CV-1323

1    with an earlier one would not require that it be vacated.

2         The circumstances here are anything but normal, and provide a series of independent

3    grounds for vacating the award.  As demonstrated below, the partial award must be vacated

4    because it violates core requirements of the Federal Arbitration Act (the "FAA"), was issued in

5    manifest disregard of the law (in several respects), and is not rationally based on the language of

6    the arbitration agreement.

7         23andMe is a genetic testing company that provides individuals with direct access to their

8    personal genetic information.  Following publication of a letter that the Company received from

9    the Food and Drug Administration (the "FDA"), two sets of consumer class action lawyers filed

10   complaints against the Company with the American Arbitration Association (the "AAA").  The

11   complaints were filed on behalf of the same class, and made the same allegations and claims, *i.e.*,

12   that the FDA letter indicated that statements on 23andMe's website were false or misleading.

13        The all-important threshold question in the dispute was whether 23andMe's arbitration

14   agreement authorized class members to assert the claims against the Company as a class.

15   Although the complaints asserted the same claims on behalf of the same class, the lawyers could

16   not agree on a co-counsel arrangement to pursue them in a single AAA proceeding, and the

17   question whether the arbitration agreement authorized class members to pursue the claims as a

18   class was adjudicated in a "clause construction" motion in the earlier-filed proceeding.

19        After extensive briefing and argument, a distinguished arbitrator issued a carefully

20   reasoned partial final award, in which he: (1) expressed a strong personal preference for ruling

21   that the arbitration agreement authorized class arbitration; but (2) held that there was no good

22   faith basis for issuing such a ruling because the language of the arbitration agreement and

23   controlling law precluded it.  Because the ruling on the clause construction motion adjudicated a

24   threshold question as part of a single controversy (and was plainly correct), that is where the

25   matter should have ended.  It did not.

26        The lawyers who filed the clause construction motion the first time provided their motion

27   papers to their colleagues, and the same process began again.  In a second clause construction that

28   closely resembled the first, a second set of lawyers asked a new arbitrator to negate the ruling that

2

1  had just been made, and permit the same class to pursue the same claims, based on the same

2  language in the same arbitration agreement and the same controlling law.  The arbitrator then

3  nullified the prior adjudication, despite the absence of any good faith basis for doing so, thereby

4  clearing the path for him to preside over a lucrative class arbitration.

5        As a review of the award against the backdrop of the adjudication it nullified makes

6  unmistakably clear, the second award was issued in manifest disregard of the controlling law, and

7  is not rationally derived from the language of the arbitration agreement.  Those defects provide

8  ample grounds for granting this motion, but the award must also be vacated for reasons that are

9  more fundamental.

10       The re-adjudication directly contravenes core purposes, policies and requirements of the

11  FAA as articulated by the Supreme Court, and Section 10(a)(4) of the statute.  In addition to

12  being patently unfair, permitting members of the same class to re-litigate the threshold question

13  whether the same arbitration agreement authorizes the class to pursue the same claims against the

14  same company until they get a favorable ruling provides several independent grounds for vacating

15  the award based on the FAA.

16       Because the FAA-related defects are not based on the arbitration agreement, or any factual

17  determination, the reasons for the judicial deference normally accorded arbitration awards on a

18  motion to vacate do not apply.  Moreover, in the highly unusual circumstances of this case, in

19  deciding whether to vacate the award the Court can review both of the conflicting awards issued

20  on the same threshold issue and determine which comports with controlling law.

21       When two diametrically opposed awards are rendered on the same issue in the same

22  controversy, the court can -- and should -- consider both awards even though only one of them is

23  challenged on the motion to vacate.  This case false squarely within that category.  Enforcing the

24  second award would nullify the first and deprive it of any effect.  The same arbitration agreement

25  cannot both **preclude** and **authorize** members of the same class to proceed with the same claims

26  on a class-wide basis.  As the case law recognizes, such a conflict can only be resolved via a

27  judicial determination.

28       In the alternative, the Court could hold a ruling on this motion in abeyance, pending a

3

1  judicial determination on the question of whether the arbitration agreement authorizes to assert

2  claims as a class. which will be made by the San Francisco Superior Court via a motion for

3  summary judgment scheduled for hearing on June 1, 2015.

4  **II.    FACTUAL BACKGROUND**

5      **A.    23andMe**

6      23andMe is a personal genetics company dedicated to helping consumers access and

7  understand their personal genetic data in a cost-effective manner, and to advancing scientific

8  research in human genetics.  The Company was founded in 2006, employs a staff of scientists,

9  participates in medical school and research programs, and has a scientific advisory board

10  composed of recognized experts in human genetics, bioinformatics and computer science.

11      The Company's product, the Personal Genome Service ("PGS"), was named Invention Of

12  The Year by *Time* Magazine in 2008, and has recently received its first FDA marketing approval.

13  Customers purchasing the PGS submit DNA via a saliva sample that is tested using state of the art

14  equipment.  Based on a reading of nearly 1,000,000 points on the customer's genome, the

15  Company provides raw genetic data and a variety of related information that is accessed on the

16  23andMe website.

17      **B.    The Arbitration Agreement**

18      Customers purchase the PGS on 23andMe's website, pursuant to terms of service that

19  include an arbitration agreement (the "Arbitration Agreement") that provides for binding

20  arbitration before the American Arbitration Association.  The Arbitration Agreement provides:

21      **Applicable law and arbitration.**  Except for any disputes relating to intellectual
    property rights, obligations, or any infringement claims, any disputes with

22      23andMe arising out of or relating to the Agreements ("Disputes") shall be
    governed by California law regardless of <u>your</u> country of origin or where <u>you</u>

23      access 23andMe, and notwithstanding of any conflicts of law principles and the
    United Nations Convention for the International Sale of Goods.  Any Disputes
    shall be resolved by final and binding arbitration under the rules and auspices of

24      the American Arbitration Association, to be held in San Francisco, California, in
    English, with a written decision stating legal reasoning issued by the arbitrator(s)

25      at <u>either party's</u> request, and with arbitration costs and reasonable documented
    attorneys' costs of <u>both parties</u> to be borne by <u>the party</u> that ultimately loses.

26      <u>Either party</u> may obtain injunctive relief (preliminary or permanent) and orders to
    compel arbitration or enforce arbitral awards in any court of competent

27      jurisdiction.

28  Ex. B at ¶ 28(b) (underlined emphasis added).

4

C.     **The November 22, 2013 FDA Letter**

On November 22, 2013, a letter from the Food and Drug Administration (the "FDA Letter") directing the Company to discontinue marketing of the health information component of the PGS until it received FDA marketing authorization.  The letter did not assert that any statement made by 23andMe with respect to the PGS was inaccurate, and the FDA had been aware that 23andMe was marketing the PGS while the Company was pursuing FDA approvals.

D.     **The Arbitration Claims Based On The FDA Letter**

The FDA Letter prompted litigation and arbitration claims against 23andMe.  The court cases were dismissed on the basis of the 23andMe arbitration agreement, which Judge Lucy Koh determined was valid and enforceable.

On December 23, 2013, Mason Livingston and Vladimir Druskin filed a class action complaint and demand for class arbitration with the American Arbitration Association on behalf of a class consisting of "[a]ll persons who purchased a 23andMe Saliva Collection Kit and Personal Genome Service in the United States" (the "Class").  *See* Ex. C at ¶ 47.  Two other members of the Class, Karen Davis-Hudson and Sarah Diaz, filed a second class action complaint and demand for class arbitration with the AAA on behalf of the Class, which was described as "all purchasers of 23andMe's Saliva Collection Kit and Personal Genome Service."  *See* Ex. D at ¶ 20.

The *Livingston* and *Davis-Hudson* complaints were based on the FDA Letter, which was quoted at length, and the same alleged facts.  Each asserted the same essential claims (the "Claims").  The Claims asserted on behalf of the Class were based on allegations that statements regarding the PGS were false and misleading in light of the FDA Letter, and that 23andMe had therefore (among other things) violated Sections 17200 *et seq.* and 17500 *et seq.* of the California Business & Professions Code, breached warranties, and been unjustly enriched.  *See* Ex. C at ¶¶ 1-4, 59-111; Ex. D at ¶¶ 1-3, 26-73.  The complaints also sought the same relief: certification of the class, actual and punitive damages, declaratory relief and attorneys' fees and costs.  *See* Ex. C at 21; Ex. D at 17.

Because members of the same class were asserting the same class action claims as part of

5

1  the same controversy, 23andMe requested the AAA to consolidate the *Davis-Hudson* matter with

2  the first-filed *Livingston* matter, and made the same request of counsel who filed the two

3  complaints.  The AAA refused to combine the cases absent agreement of the lawyers asserting

4  claims, who were unable to reach an agreement regarding lead counsel.

5          **E.**      **The Clause Construction Adjudications**

6          On July 18, 2014 the lawyers who filed the *Livingston* complaint filed a 12-page "clause

7  construction brief," seeking a threshold determination that the Arbitration Agreement authorized

8  members of the Class to pursue the Claims asserted against 23andMe as a class.  Ex. E.  23andMe

9  filed a 21 page Opposition to the Motion (Ex. F), and Claimants filed a 14 page Reply (Ex. G).

10  The clause construction motion was argued in person before Yaroslav Sochynsky, a well-known

11  arbitrator with an impeccable reputation, for more than two hours.

12          On September 17, 2014, Mr. Sochynsky issued a carefully reasoned Partial Final Clause

13  Construction Award based on the contract language and controlling case law.  Ex. H.  Despite his

14  expressed preference for class arbitration (*see* Ex. H at 8, 13), Mr. Sochynsky held that there was

15  simply no way in which an arbitrator could reach such a result, including because the Arbitration

16  Agreement was worded exclusively in **bi**lateral terms, and under the controlling case laws there

17  was no good faith basis for ruling that it authorized **multi**lateral class arbitration.

18          The award pointedly explained that there was no good faith basis on which an arbitrator

19  could rule that the Agreement authorized class arbitration: "Given that the 23andMe agreement to

20  arbitrate is clearly framed in bilateral terms, and given the foregoing California precedent, this

21  tribunal sees no reasonable alternative (i.e., one that would be based on a good faith interpretation

22  of the parties' agreement) but to conclude that the parties in this case did not agree to arbitrate

23  claims on behalf of a class."  Ex. H at 8.  In ruling on the clause construction motion the first time

24  (the "First Adjudication"), the arbitrator also stated that he was "obliged to follow the law,"

25  irrespective of his preference for class arbitration, and that "this tribunal is not prepared to adopt

26  an interpretation that it cannot justify by a good faith construction of the language used by the

27  parties in their arbitration agreement, simply in order to reach what might be considered a desired

28  result."  Ex. H at 13.

On September 18, 2014, the very next day, different members of the Class filed a second clause construction motion, after counsel provided them with the motion papers filed in connection with the motion the first time it was filed.  The motion sought to re-litigate the precise question determined in the First Adjudication, *i.e.,* whether the Arbitration Agreement authorized the Class to assert the Claims against 23andMe as a class.  Ex. I.

The Company was forced to file a second 27-page Opposition (Ex. J), which argued that the issue had already been adjudicated, and provided the arbitrator with the *Livingston* award, and the brief 23andMe filed in connection with the First Adjudication.  The Opposition also included a table identifying the repetition of arguments from the clause construction motion when it was filed the first time, and where the arguments were refuted in the first Opposition and rejected in the First Adjudication:

| CLAIMANTS' ARGUMENT (EX. I) | ARGUED IN *LIVINGSTON* (EX. E) | REFUTED IN *LIVINGSTON* (EX. F) | ADJUDICATED IN CLAUSE CONSTRUCTION AWARD (EX. H) |
|---|---|---|---|
| The arbitration clause applies to "any disputes" with 23andMe arising out of or relating to the agreement (Cls.' Mem. at 5-8) | Argued at p. 8 | Refuted at p. 14 | Rejected at p. 9 |
| The arbitration clause provides that California law, which favors class arbitration, governs (Cls.' Mem. at 12-13) | Argued at pp. 6-7 | Refuted at pp. 12-14 | Rejected at p. 9 |
| Any ambiguities within the arbitration clause must be construed against 23andMe, as the drafter (Cls.' Mem. at 13) | Argued at pp. 10-11 | Refuted at pp. 6-7, 16 | Rejected at p. 11 |
| The arbitration clause explicitly requires that such disputes be resolved by "arbitration under the rules and auspices" of the AAA, which accommodate class action arbitration (Cls.' Mem. at 8-10) | Argued at p. 9 | Refuted at pp. 18-19 | Rejected without comment[2] |
| The arbitration clause does not exclude class arbitration even though it makes exceptions for intellectual property claims and claims for injunctive relief (Cls.' Mem. at 10-12) | Argued at pp. 8-11 | Refuted at p. 16 | Rejected at p. 10 |

---

[2] Mr. Sochynsky did not specifically address this argument because Rule 3 of the AAA's Supplementary Rules for Class Arbitration specifically forbids consideration of the AAA rules in determining whether an arbitration agreement authorizes class arbitration.

7

1   Claimants filed an 18-page Reply (Ex. K) and the threshold question whether the

2   Arbitration Agreement authorized the Class to pursue the Claims as a class was argued again, for

3   approximately three hours, on December 2, 2014.  In a transparently result-oriented and at times

4   incomprehensible award (Ex. A), the arbitrator negated the First Adjudication, and held that the

5   Arbitration Agreement authorized the Class to assert the Claims as a class (the

6   "Re-Adjudication").

7   On January 14, 2015 the *Livingston* award was confirmed by the San Francisco Superior

8   Court, and reduced to a judgment.  Ex. L.  After the briefing on the second clause construction

9   motion was completed, the California Court of Appeal decided *Garden Fresh Rest. Corp. v.*

10  *Superior Ct.*, 231 Cal. App. 4th 678 (2014), which held that the question whether an arbitration

11  agreement authorizes class action arbitration is "vastly more consequential" than the gateway

12  question whether there is an enforceable agreement to arbitrate, and that the question was

13  therefore a gateway issue to be determined by the courts.  *Id.* at 687.

14  23andMe filed a motion for reconsideration of the award issued in the Re-Adjudication

15  (Ex. M) on January 21, 2015.  Among other things, the motion demonstrated how and why

16  permitting members of the Class to re-litigate the pivotal threshold question whether they can

17  pursue the Claims as a class until they find an arbitrator willing to rule in their favor is directly

18  contrary to the requirements and language of the FAA.  The motion demonstrated how and why

19  the Re-Adjudication manifestly disregarded the controlling case law, including *Stolt-Nielsen* and

20  a host of California cases applying *Stolt-Nielsen* to arbitration agreements virtually identical to

21  the 23andMe Agreement.  It further demonstrated that the award was not rationally derived from

22  the language of the Arbitration Agreement.

23  The arbitrator denied the motion for reconsideration without argument on March 2, 2015.

24  Ex. N.  The ruling recites the procedural background and documents filed, states that the

25  arbitrator had read the documents, and then simply states that the motion "is Denied."

26  **F.    The Superior Court Action**

27  On February 13, 2015, the lawyers who filed the *Livingston* arbitration complaint found

28  another member of the Class, and filed an action for declaratory relief against 23andMe in San

8

1    Francisco Superior Court (the "San Francisco Superior Court Action").  Ex. O.

2          After highlighting the conflicting arbitrator rulings on the same threshold question the

3    First Adjudication and its nullification in the Re-Adjudication (Ex. O ¶ 2), the complaint cites

4    *Garden Fresh* and two recent federal decisions, and alleges that the question whether the

5    Arbitration Agreement authorizes class arbitration is a gateway question that must be decided by

6    a court (Ex. O ¶¶ 4, 5, 17).  On that basis -- and because a judicial determination provides the

7    only means of resolving the issue with finality -- the San Francisco Superior Court Action seeks a

8    judicial determination whether the Arbitration Agreement authorizes class arbitration.

9          The parties to the San Francisco Superior Court Action have stipulated to a briefing

10   schedule with respect to judicial determination of the gateway question whether the Arbitration

11   Agreement authorizes the Class to assert the Claims as a class via a motion for summary

12   judgment.  A hearing on the motion is scheduled for June 1, 2015.

13   **III.   <u>ARGUMENT</u>**

14         The Re-Adjudication collides head-on with the policies, objectives and requirements of

15   the FAA as articulated by the Supreme Court, and with the language of the statute.  As the

16   Supreme Court's decision in *Stolt-Nielsen* makes clear, the award can be vacated on that basis

17   alone.  The award should also be vacated because the arbitrator acted in manifest disregard of the

18   FAA, and acted in excess of his powers.

19         Because the Re-Adjudication produced an award that is diametrically opposed to a

20   just-issued adjudication of the same threshold issue in the same controversy, this is not the normal

21   situation presented on a motion to vacate an arbitration award.  In such unusual circumstances the

22   Court can consider both awards together -- even though only one is the subject of the motion to

23   vacate – and determine which one comports with the contract and controlling law.  Indeed, a

24   judicial determination of the issue is the **only** means of adjudicating it in a manner that is mutual

25   and final.

26         Alternatively, if the Court is for any reason not inclined to follow that procedure, it could

27   defer to the judicial determination whether the 23andMe arbitration agreement authorizes class

28   arbitration that will be made in the San Francisco Superior Court Action.  That result would be

9

1    consistent with California law as enunciated in a recent California Court of Appeal decision

2    holding that the question of whether an arbitration agreement authorizes class arbitration is a

3    gateway question to be decided by a court.

4         The award must also be vacated because it was rendered in manifest disregard of

5    controlling law that mandated the opposite ruling.  The fact that the award is not rationally

6    derived from the language of the Arbitration Agreement provides a further ground on which it

7    should be vacated.

8         A.    **The Re-Adjudication Violates The Requirements Of The FAA**

9         The FAA was enacted under the Commerce Clause and establishes a national framework

10   for arbitrations and arbitration agreements that affect interstate commerce.  *See*, *e.g.*, 9 USC §§ 1-

11   2; *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011).  Accordingly, federal and

12   state courts can vacate arbitration awards, and invalidate statutes and judicial rules, when they

13   violate the purposes, policies and requirements of the FAA, or create an obstacle to

14   accomplishment of the Act's objectives or scheme inconsistent with the statute, or interfere with

15   fundamental attributes of arbitration.  *See*, *e.g.*, *Concepcion*, 131 S. Ct. at 1745 (striking down

16   judicial rule where it "stood as an obstacle to the accomplishment and execution of the full

17   purposes and objectives" of the Act); *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S.

18   662, 682 (2010) (vacating award where it failed to "give effect to the contractual rights and

19   expectations of the parties"); *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1162 (9th

20   Cir. 2013); *Iskanian v. CLS Transportation L.A. LLC*, 59 Cal. 4th 348, 366 (2014).

21        As the Supreme Court has held, the "overarching purpose of the FAA, evident in its

22   text . . . is to ensure the enforcement of arbitration agreements according to their terms, so as to

23   facilitate streamlined proceedings."  *Concepcion*, 131 S. Ct. at 1748; *see also Preston v. Ferrer*,

24   552 U.S. 346, 357-58 (2008); *Iskanian*, 59 Cal. 4th at 369.  The FAA also requires that arbitration

25   agreements be enforced according to the intention of the parties.  *See*, *e.g.*, *Mitsubishi Motors*

26   *Corp. v. Soler Chrystler-Plymouth, Inc.*, 473 U.S. 614, 626 (2008).

27        Section 10(a)(4) provides that arbitration awards may be vacated when arbitrators exceed

28   their powers, "or so imperfectly executed them that a **mutual**, **final** and **definitive** award upon

10

the **subject matter** submitted was not made." 9 U.S.C. § 10(a)(4) (emphasis added).  Section 2 of the FAA refers to arbitrations to settle a "controversy."  9 U.S.C. § 2.

### 1.    The Re-Adjudication Is The Antithesis Of A "Streamlined Proceeding"

It is readily apparent that the Re-Adjudication does not "facilitate streamlined proceedings." *Concepcion*, 131 S. Ct. at 1748.  The same critical threshold question was litigated, and then re-litigated, at great expense, and under the procedure adopted in the award it could be relitigated *ad infinitem*.

The First Adjudication determined the threshold issue after a major expenditure of time, effort and money in briefing, arguing and ruling on the issue.  See page 6 above.

Despite a carefully reasoned award demonstrating that there was "no good faith basis" upon which an arbitrator could conclude that the Class was authorized to arbitrate the Claims on a class-wide basis, the process then began all over again -- the day after the issue was adjudicated -- resulting in a second major expenditure of time, effort and money re-briefing and re-arguing the same question because the second arbitrator abjectly refused to defer to the existing adjudication. See pages 7-8 above.

Requiring 23andMe to re-litigate the same threshold question is even more egregious because the question is so important.  As the California Court of Appeal noted in *Garden Fresh*, the question whether an arbitration agreement provides for class arbitration "is vastly more consequential" than even the gateway question whether there is a valid agreement to arbitrate, and held that it must therefore be determined by a court.  231 Cal. App. 4th at 687.  Two federal courts of appeal have reached the same conclusion.  *See Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 2291 (2014); *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 335 (3d Cir. 2014), *cert. denied*, 2015 WL 998611 (U.S. Mar. 9, 2015).  The Supreme Court has underscored that fact, noting that class arbitration "greatly increases risks to defendants," results in a process that is "poorly suited to high stakes class litigation," and "makes the process slower, more costly and more likely to generate a procedural morass."  *Concepcion*, 131 S. Ct. at 1751-53; *see also Stolt-Nielsen*, 559

11

1   U.S. at 686 (listing the "fundamental changes brought about by the shift from bilateral arbitration

2   to class-action arbitration").

3        Permitting members of the same class to re-litigate the same all-important threshold

4   question until they get a favorable ruling **ensures** that the process will be "slower, more costly,

5   and more likely to generate a procedural morass."  131 S. Ct. at 1751.  Moreover, the end result

6   of the asymmetric serial re-litigation is likely to be imposition of a cumbersome class action not

7   contemplated or authorized by the arbitration agreement, as happened in this case.  *See*, *e.g.*,

8   *Mitsubishi Motors*, 473 U.S. at 628 ("By agreeing to arbitrate . . . . [a party] trades the procedures

9   and opportunity for review of the courtroom for the simplicity, informality and expedition of

10  arbitration.")

11              **2.    The Process Adopted And Enforced Via Re-Adjudication Contravenes
12                      The Intention Of The Parties**

13       The FAA was enacted to ensure that arbitration agreements are enforced in accordance

14  with the intention of the parties, and "'the parties' intentions control.'" *Stolt-Nielsen*, 559 U.S. at

15  683 (quoting *Mitsubishi*, 473 U.S. at 626).

16       There is no chance that the parties intended that the threshold question of whether the

17  Arbitration Agreement authorizes class arbitration would be re-litigated in the same controversy

18  involving the same claims and same class until a class member obtained a favorable ruling.  As

19  the Supreme Court has emphasized, "a [company] may not be compelled under the FAA to

20  submit to class arbitration unless there is a contractual basis for concluding that the [company]

21  *agreed* to do so." *Id.* at 684 (emphasis in original); *see also Concepcion*, 131 S. Ct. at 1752 ("We

22  find it hard to believe that defendants would bet the company with no effective means of

23  review").  No company would ever intend such an irrational, unfair and expensive result,

24  particularly when the company is bound by an adverse ruling and class members are not.  The

25  lawyers seeking to pursue class action claims and an arbitrator who wanted to preside over a class

26  action proceeding were nevertheless able to impose it.

27

28

**3.**     **The Process Adopted In The Re-Adjudication Does Not Ensure That The Arbitration Agreement Will Be Enforced According To Its Terms**

The Re-Adjudication also contravenes the FAA's fundamental purpose "to ensure that arbitration agreements are enforced according to their terms." *Concepcion*, 131 S. Ct. at 1748; *Stolt-Nielsen*, 559 U.S. at 664; *see, e.g.*, *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 469 (1989). In addressing the FAA's primary purpose in *Mortensen*, the Ninth Circuit emphasized the word "'ensure' is defined to mean . . . 'to make sure, certain or safe.'" 722 F.3d at 1159.

The award issued in the Re-Adjudication refused to enforce the arbitration agreement according to its terms, and adopted a process that ensures that result. The terms of the arbitration agreement either authorize class arbitration under the governing law, or they do not authorize it. The outcome is binary. Permitting one side -- and **only** one side -- to re-litigate the question until it gets the ruling it desires, irrespective of a prior adjudication of the same question to the contrary, obviously does not ensure that the contract is enforced according to its terms. It does the opposite.

**4.**     **The Process Adopted In The Re-Adjudication Effectively Requires The Availability Of Class Arbitration**

As the Supreme Court held in *Concepcion*: "Requiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." 131 S. Ct. at 1748. As this case demonstrates, permitting different members of the same class to re-litigate the threshold question whether an arbitration agreement authorizes class action arbitration effectively "require[s] the availability of classwide arbitration." It does not matter that one arbitrator follows the law notwithstanding a personal desire to override it, or that there is only one ruling that can be rendered in good faith. A second arbitrator who is not similarly constrained, and has a financial interest in presiding over a class action, can simply nullify any adjudication in favor of the company.

**5.**     **The Re-Adjudication Contravenes Section 10(a)(4) Of The FAA**

Perhaps most important, the Re-Adjudication is contrary to Section 10(a)(4) of the FAA,

13

1  which expressly authorizes district courts to vacate arbitration awards when the arbitrator

2  "imperfectly executed" his powers such "that a mutual, final and definitive award on the subject

3  matter submitted was not made."  9 U.S.C. § 10(a)(4).  By overriding the First Adjudication, and

4  issuing an award that mandates the polar opposite result with respect to the same threshold

5  question in the same controversy, the arbitrator made a mockery of this provision.

6          The "subject matter submitted" in the conflicting adjudications was exactly the same.

7  Members of the identically defined class sought a ruling that the same arbitration agreement

8  authorized the class to assert the same claims against 23andMe on a class-wide basis, as part of

9  the same "controversy" for purposes of section 2 of the FAA (9 U.S.C. § 2).  See pp. 5-8 above.

10         By nullifying the First Adjudication, the award created a situation that is the polar

11  opposite of "final and definite," and destroyed any semblance of "mutuality."  Representatives of

12  the Class can pursue the process indefinitely, without being bound by an adverse ruling.  A ruling

13  that the arbitration agreement does not authorize the class to pursue claims as a class is

14  meaningless because other class members (or even the same ones) can continue the process until

15  they find an arbitrator willing to nullify it, while the company is bound by any adverse ruling on

16  the exact same threshold issue.

17         As this case further illustrates, the fact that arbitrators want to conduct class action

18  arbitrations (and have a strong financial stake in the outcome of the threshold determination)

19  makes it likely that counsel seeking to pursue a class arbitration will succeed in nullifying a ruling

20  in favor of the company, irrespective of whether there is any good faith basis for doing so.

21         The lack of -- and inability to obtain -- a mutual, final and definite award results from an

22  "imperfect" execution of the arbitrator's power in two fundamental respects.  First, as noted

23  above, the Re-Adjudication is directly contrary to the policy, requirements and language of the

24  FAA.  Second, as shown at pages 16-25 below, the award was rendered in manifest disregard of

25  the law, and is not rationally derived from the language of the Arbitration Agreement.

26      **B.**      **The Court Can Determine Which Award Governs**

27         When two directly contrary awards are rendered on the same issue in connection with the

28  same essential controversy, the rules that normally restrict judicial review of an arbitration award

14

1   are relaxed.  Arbitrators normally defer to prior rulings on the same issue, but when they depart

2   from that practice -- and one ruling effectively nullifies the other -- the court must consider both

3   awards and determine which one should prevail.  That is true irrespective of the fact that the

4   awards were issued in separate proceedings, and only one of them is at issue on the motion to

5   vacate.  *See Connecticut Light & Power Co. v. Local 420, Int'l Brotherhood of Electrical*

6   *Workers, AFL-CIO*, 718 F.2d 14 (2d Cir. 1983); *see also Trailways Lines, Inc. v. Trailways Inc.*

7   *Joint Council*, 807 F.2d 1416 (8th Cir. 1986).

8         As the Second Circuit explained in *Connecticut Light & Power*, while courts have

9   generally concluded "that arbitrators are not bound by the rationale of earlier decisions and that

10   inconsistency with another award is not enough by itself to justify vacating an award," the rule is

11   different when the conflicting awards purport to resolve the identical issue regarding the same

12   contract as part of the same dispute.  718 F.2d at 20.  The court noted that it was faced with an

13   unusual situation, in that although only one of the awards "was challenged in the present

14   proceeding, a second arbitrator explicitly rejected both [its] reasoning and conclusion."  *Id.*

15   Accordingly, one of the awards "would for all practical purposes give no weight to [the other

16   arbitrator's] view of the meaning of the collective bargaining agreement."  The Second Circuit

17   therefore held that the court "must resolve the conflict between the two awards."  *Id.* at 21.

18         More specifically, *Connecticut Power & Light* held that "[w]here inconsistent awards

19   have been made, and a need for resolving the conflict is evident, the court must, as a first step,

20   determine whether each award, viewed separately, draws its essence from the contract."  *Id.*  As

21   demonstrated at pages 16-25 below, that is not a close question here.  The award issued in the Re-

22   Adjudication cannot be reconciled with the language of the Arbitration Agreement or the

23   controlling case law, and can **only** have "drawn its essence" from a **different** source.

24         If both awards draw their essence from the contract, the court must "move to a second step

25   and determine which decision conforms most closely to the intent of the parties," and "is the most

26   persuasive of the two."  *Id.*  Again, that is not a close question.

27

28

15

**C.**     **This Court Can Also Defer To The Determination To Be Made In The San Francisco Superior Court Action**

As noted at pages 8-9 above, counsel who filed the clause construction motion the first time has filed an action on behalf of another member of the Class seeking a judicial determination whether the arbitration agreement provides for class arbitration.  Ex. O.  The San Francisco Superior Court Action is based on a recent California Court of Appeal decision holding that the threshold question of whether an arbitration agreement provides for class arbitration is a threshold question to be decided by a court.

The San Francisco Superior Court will determine the threshold question whether the Arbitration Agreement authorizes the Class to assert classwide claims (yet again) on a motion for summary judgment, and a hearing on the motion for summary judgment is scheduled for June 1, 2015.  If the Court is for any reason not inclined to vacate the *Davis-Hudson* award based on the procedure prescribed in *Connecticut Light & Power*, 23andMe requests that the Court defer ruling on this motion pending a judicial determination of the question, and apply the state court ruling in this proceeding.

**D.**     **The Arbitrator's Award Is Completely Irrational And Exhibits A Manifest Disregard Of Controlling Law.**

Ninth Circuit precedent authorizes courts to vacate an arbitrator's award when the award is "completely irrational," or exhibits a "manifest disregard of law."  *Comedy Club, Inc. v. Improv W. Associates*, 553 F.3d 1277, 1290 (9th Cir. 2009); *accord Johnson v. Wells Fargo Home Mortg., Inc.,* 635 F.3d 401, 414 & n.10 (9th Cir. 2011).

When an arbitrator recognizes the applicable law, but ignores it, the award should be vacated.  *Comedy Club*, 553 F.3d at 1290.  Thus, in *Comedy Club*, the Ninth Circuit vacated an arbitrator's award where the arbitrator, while aware of controlling case law, nevertheless erroneously interpreted it in such a way as to render it inapplicable, and disregarded well-established case law. *See id.* at 1293.

"If the arbitrator's decision 'strains credulity' or 'does not rise to the standard of barely colorable,' a court may conclude that the arbitrator 'willfully flouted the governing law by

16

1    refusing to apply it.'" *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 92-93 (2d Cir.

2    2008) (citations omitted), *rev'd on other grounds*, 559 U.S. 662 (2010); *accord Pearson Dental*

3    *Supplies, Inc. v. Super. Ct.*, 48 Cal. 4th 665, 677 n.3 (2010).

4        While merely establishing that the arbitrator misinterpreted the law will not suffice to

5    vacate an arbitration award, an arbitrator's decision is nevertheless "subject to challenge if the

6    decision fairly can be said to be 'completely irrational.'" *Freightliner, LLC v. Teamsters Local*

7    *305*, 336 F. Supp. 2d 1118, 1126 (D. Or. 2004) (quoting *Todd Shipyards Corp. v. Cunard Line,*

8    *Ltd.*, 943 F.2d 1056, 1060 (9th Cir. 1991)).  Vacatur is therefore appropriate when an arbitrator's

9    interpretation of "well defined, explicit and clearly applicable" controlling precedent is irrational -

10   even though the arbitrator nominally gives "lip service" to the law in his award.  *See id.* at 1127.

11       Here, the arbitrator did not merely render an award on which reasonable minds could

12   disagree.  There was **no** "good faith" basis for the award.  As was the case in *Freightliner* and

13   *Comedy Club*, the arbitrator nominally addressed well-defined and explicit controlling case law,

14   then disregarded it completely and imposed his own notions of what the law "should be."  That is

15   "an approach tantamount to 'ignoring the law'" or "impos[ing] his own policy preference."

16   *Freightliner*, 336 F. Supp. 2d at 1127; *Stolt-Nielsen*, 559 U.S. at 676.

17       Indeed, the second award disregards a plethora of controlling Federal and California case

18   law -- the same controlling Federal and California case law that Mr. Sochynsky held provided

19   "**no reasonable alternative** (i.e. one that would be based on a **good faith interpretation of the**

20   **parties' agreement**" that would allow for class arbitration under the identical bilateral arbitration

21   agreement at issue. Ex. H at 8-9 (emphasis added).  Based on a series of controlling cases that (1)

22   cannot be distinguished from this one, and (2) **uniformly** hold that the language contained in the

23   Arbitration Agreement does not authorize class arbitration, Mr. Sochynsky set aside his personal

24   preference for class arbitration because he was "obliged to follow the law," and the controlling

25   "legal precedent" dictated the ruling issued in the First Adjudication. Ex. H at 8, 13.

26       While that manifest disregard of the law provides more than sufficient grounds for

27   vacating the award, the arbitrator also disregarded the FAA in several fundamental respects.  See

28   pages 10-14 above.  The award should be vacated on that basis as well.

1.    **No *Rational* Interpretation of Controlling Case Law Could Possibly Justify The Arbitrator's Award.**

As the Supreme Court has repeatedly held, "the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Stolt-Nielsen*, 559 U.S. at 687. Accordingly, class arbitration is permitted only when "the parties *agreed to authorize* class arbitration." *Id.* (emphasis in original).

A virtual avalanche of California cases applying *Stolt-Nielsen* have without exception held that arbitration agreements that -- exactly like the Arbitration Agreement here -- are cast exclusively in bilateral terms and do not refer to class or group arbitration do not authorize class arbitration. *See, e.g., Nelsen v. Legacy Partners Residential, Inc.*, 207 Cal. App. 4th 1115, 1128-31 (2012); *Kinecta Alternative Fin. Solutions, Inc. v. Super. Ct.*, 205 Cal. App. 4th 506, 517-19 (2012); *Network Capital Funding Corp. v. Papke*, 178 Cal. Rptr. 3d 658, 669 (2014), *review granted on other grounds* by 340 P.3d 1043 (Cal. 2015);[3] *Rivera v. Hilton Worldwide, Inc.*, 2013 WL 6230604, at *4-5 (Cal. Ct. App. Nov. 26, 2013); *Ramos v. Fry's Elecs., Inc.*, 2014 WL 6269307 (Cal. Ct. App. Nov. 17, 2014); *Whalley v. The Wet Seal, Inc.*, 2013 WL 6057679, at *4-6 (Cal. Ct. App. Nov. 15, 2013); *Arroyo v. Riverside Auto Holdings*, 2013 WL 4997488, at *3-4 (Cal. Ct. App. Sept. 13, 2013); *McElroy v. Tenet Health Care Corp.*, 2013 WL 4482928, at *6-7 (Cal. Ct. App. Aug. 21, 2013); *Reyes v. Liberman Broad., Inc.*, 208 Cal. App. 4th 1537, 1543-45 (2012), *review granted on other grounds and then dismissed in light of Iskanian*, 59 Cal. 4th 348, 366 (2014); *Lopez v. Ace Cash Express, Inc.*, 2012 WL 1655720, at *7-8 (C.D. Cal. May 4, 2012); *Chico v. Hilton Worldwide, Inc.*, 2014 WL 5088240, at *12 (C.D. Cal. Oct. 7, 2014).

Indeed, California cases applying *Stolt-Nielsen* have unanimously concluded that bilateral language in arbitration agreements **affirmatively preclude** class arbitration.  Like the dozens of California cases cited above, the 23andMe Arbitration Agreement is cast exclusively in two-party

---

[3] Federal courts "may consider unpublished [California] state decisions."  *Emps. Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003); *see also Beeman v. Anthem Prescription Mgmt., LLC*, 689 F.3d 1002, 1008 n.2 (9th Cir. 2012).

18

terms:

> Any Disputes shall be resolved by final and binding arbitration under the rules and auspices of the American Arbitration Association, to be held in San Francisco, California, in English, with a written decision stating the legal reasoning issued by the arbitrator(s) at <u>either party</u>'s request, with arbitration costs and reasonable documented attorneys' costs of <u>both parties</u> to be borne by <u>the party</u> that ultimately loses. <u>Either party</u> may obtain injunctive relief . . . . (Ex. B at ¶ 28(b))

It uses the terms "you" and "your" to refer to a single claimant: "[A]ny disputes with 23andMe arising out of or relating to the Agreement ("Disputes") shall be governed by California law regardless of <u>your</u> country or origin or where <u>you</u> access 23andMe . . . ." *Id.* The agreement does not mention class actions, groups or anything other than bilateral adjudication of individual claims.

Based on language identical to that contained in the 23andMe arbitration agreement ("*at either party's request*"), and the fact that the arbitration agreement identified only two parties, *Nelsen* held that the arbitration clause addressed <u>the claimant's</u> rights and obligations *vis a vis* the company, "not those of other employees or groups of employees." 207 Cal. App. 4th at 1129-30 & n.7. Applying *Stolt-Nielsen*, the California Court of Appeal held that the use of two-party language barred class arbitration. *Id.* at 1131. As *Nelsen* explained, two-party language precludes class-action arbitration because it "unambiguously negates" any intention to engage in a class-wide adjudication. *Id.* at 1130.

*Kinecta* applied *Stolt-Nielsen* and reached the same result based on the reasoning employed in *Nelsen*. The arbitration agreement there referred to two parties: the company and "me." 205 Cal. App. 4th at 511. The California Court of Appeal granted an employer's petition for a writ of mandate overturning an order permitting class arbitration, based on the two-party language: "The arbitration provision identifies only two parties to the agreement," and makes no reference to "employee groups or other employees," but "instead refers exclusively to 'I,' 'me,' and 'my' . . . ." *Id.* at 517. As was the case in *Kinecta*, the 23andMe Arbitration Agreement identifies two parties, and refers exclusively to the claimant (although it uses "you" instead of "I"), and does not refer to others or groups.

Similarly, *Whalley* ruled that two-party language in an arbitration agreement precludes a

19

1   finding that the parties agreed to class action adjudication under *Stolt-Nielsen*. 2013 WL 6057679

2   at \*4-5.  As in the 23andMe Agreement, the arbitration agreement referred to the company, and

3   used the terms "you" and "your" to refer to the individual.  *Id.*  Based on that language, the

4   California Court of Appeal held that the agreement was "not susceptible to an interpretation that

5   class actions were authorized or agreed upon."  *Id.* at \*5.

6           *Rivera* and *McElroy* likewise ruled that two-party language in an arbitration agreement

7   "demonstrates [that] arbitration was limited to disputes between plaintiff and defendant."  *Rivera*,

8   2013 WL 6230604, at \*5; *McElroy*, 2013 WL 4482928, at \*7; *see also Chico*, 2014 WL 5088240,

9   at \*12 ("[The] Arbitration Agreements repeatedly refer to Plaintiff in the singular and make no

10  reference to employee groups, putative class members, other employees, or other employees'

11  claims or disputes. Accordingly, the Court concludes that the . . . Arbitration Agreements do not

12  authorize class arbitration, and that Plaintiff shall individually arbitrate his claims.").

13          As Mr. Sochynsky acknowledged, there is no conceivable basis upon which this case can

14  be distinguished from the California Court of Appeal's decisions in *Nelsen, Kinecta, Whalley,*

15  *Rivera, McElroy* and *Reyes* (among others).  This is plainly not a case involving an unlikely but

16  nevertheless rational interpretation:  There is **literally nothing** in the 23andMe Arbitration

17  Agreement that could possibly support a ruling that the company agreed to authorize class action

18  arbitration.

19
        ## 2.    <u>The "Rationale" Of The Arbitrator's Award Underscores The Reasons</u>
20      <u>It Must Be Vacated.</u>

21          The arbitrator based his award on three primary bases.  First, he chose without explanation

22  to disregard the plethora of controlling and well-defined case law because some of the cases

23  involved "employment disputes" rather than a consumer dispute.  Ex. A at 7.  Second, the reasons

24  cited by the arbitrator as a basis for "distinguishing" identical language are facially baseless.

25  Third, the arbitrator claimed to find it significant that the Arbitration Agreement referred to "any

26  disputes" (surrounded by strictly bilateral language), but failed to follow *Network Capital*'s

27  guidance that this language did not evidence an intent by the parties to permit class arbitration.

28          Similarly, the arbitrator ruled that the Arbitration Agreement's explicit exclusion of

20

intellectual property disputes from the scope of the Agreement, but its silence with respect to class arbitration, evidenced an intent to permit class arbitration -- again, an irrational conclusion of law directly contrary to controlling precedent.  Finally, he asserted that the capitalized term "Agreement," despite being surrounded by strictly bilateral language, somehow referred to a single agreement between 23andMe and **all** of its customers.[4]

Each of the arbitrator's bases for the award is not only wrong, but so irrational and such a departure from a good faith interpretation of the law and the parties' Agreement, as to constitute reversible manifest disregard for the law.  Despite giving "lip service" to the law, the arbitrator's interpretation of the contract and cases are so irrational that they not only strain credulity, but defy it altogether.

a.      **The Arbitrator's Reference To The Fact That Some Cases Involved Employment Contracts Is Irrational, Unsupported And Unsupportable.**

As the first "explanation" of his radical departure from the controlling case law, the arbitrator stated that it was "noteworthy" that some of the cases cited by 23andMe were employment disputes, while the dispute at issue involves a retailer and consumer.  Ex. A at 7.  That is it.  The arbitrator did not attempt to provide legal or factual basis to support his distinction, and there is none.  The governing rules do not -- and cannot -- depend on the type of contract in which the arbitration agreement was included.

b.      **The Arbitrator's Attempt To Distinguish The Language In The Contract From Binding Cases Was Facially Baseless.**

The award notes that the arbitration agreements in *Kinecta* and *Network Capital* used words like "I," "me," and "my," whereas the Arbitration Agreement here used words like "you," "your," "either party," and "both parties."  Ex. A at 8-9.  There is no colorable basis for

---

[4] In fact, in several instances, the arbitrator even misquoted the arbitration agreement by failing to include bilateral language contained in the exact same sentences the arbitrator was quoting, instead replacing such language with ellipses.  This reflects either impermissible and evident partiality justifying vacatur, *see* 9 U.S.C. § 10(a)(2), or such a radical disregard for controlling precedent that it evinces the arbitrator's imposition of his own policy preference for class arbitration rather than the fulfillment of his duty to faithfully interpret the law and the parties' contract.

21

1   distinguishing words like "you" and "your" from "I," "me," or "my," and all of the language in

2   the Arbitration Agreement is exclusively bilateral.

3        Moreover, *Network Capital* did not cite or rely upon "I," "me" or "my" (or any other

4   bilateral language) as the basis for its ruling that there was no contractual basis for determining

5   that the parties agreed to class arbitration. Rather, it held that class arbitration was not authorized

6   under *Stolt- Nielsen* and the FAA because -- as in this case -- there was no contract language or

7   extrinsic evidence that might lead to that result.  *See* 178 Cal. Rptr. 3d at 670.

8        The award also manifestly disregards cases like *Nelsen* and *Whalley*, which involved

9   arbitration agreements that used two-party language **identical** to that found in the 23andMe

10   Arbitration Agreement.  In holding that the arbitration agreement did not authorize class

11   arbitration because it uses bilateral language, the California Court of Appeal in *Nelsen*

12   emphasized that the agreement, like the 23andMe Arbitration Agreement, "provides for an appeal

13   of the arbitrator's award 'at *either party's* written request.'" 207 Cal. App. 4th at 1130 (italics in

14   original).  Similarly, in holding that two-party language in an arbitration agreement precludes a

15   ruling that the parties agreed to class action adjudication, the California Court of Appeal in

16   *Whalley* emphasized that the agreement, like the Arbitration Agreement, used the terms "you"

17   and "your" to refer to the individual.  2013 WL 6057679 at *4-5.  Based on that identical

18   language, the Court of Appeal held that the agreement was "not susceptible to an interpretation

19   that class actions were authorized or agreed upon." *Id.* at *5.

20        Moreover, all of the many California Court of Appeal decisions that the arbitrator

21   manifestly disregarded relied on the fact that the arbitration agreements -- like the Arbitration

22   Agreement -- did not refer to others or groups of claimants.  The award says nothing whatsoever

23   about that critical fact, which under controlling law **further** demonstrates the absence of the

24   contractual basis required to impose class arbitration.

25            **c.**     **<u>The Arbitration Agreement's Reference to "Any Disputes," and</u>**

26                   **<u>Its Exclusion of Certain Others, Manifestly Disregarded</u>**
                **<u>Controlling Precedent.</u>**

27        The arbitrator's statement that the controlling California decisions did not consider the

28   *expressio unius est exclusio alterius* doctrine (Ex. A at 12-13) is patently incorrect, irrelevant and

22

1  irrational.  For example, the arbitration agreement in *Network Capital* required the parties "to

2  submit 'any claim, dispute, and/or controversy' between them to binding arbitration '[i]nclud[ing]

3  . . . all disputes, whether based in tort, contract, statute . . ., equitable law, or otherwise,' and

4  '[t]he sole exception [was] for claims before the [National Labor Relations Board].'"  178 Cal.

5  Rptr. 3d at 669-70.  The plaintiff in *Network Capital* argued that "the parties' intent to authorize

6  class arbitration is established by the [a]rbitration [a]greement's broad language requiring the

7  parties to submit 'any claim, dispute, and/or controversy' to arbitration and the parties' omission

8  of class arbitration from the narrow list of exceptions to that broad obligation."  *Id.* at 670.

9       The California Court of Appeal flatly rejected that argument because it "**ignores the**

10  **governing law** on the requirements for submitting claims to class arbitration," and held that the

11  parties' arbitration agreement did not authorize class arbitration.  *Id.* (emphasis added).  The same

12  controlling law requires the same result here, and to reach a contrary result clearly constitutes a

13  manifest disregard of that controlling law.

14       Similarly, *Kinecta* held that class arbitration was not authorized even though the

15  arbitration agreement at issue expressly excluded injunctive relief and certain other types of

16  claims from the scope of the agreement, but did not expressly exclude class arbitrations.  *See* 205

17  Cal. App. 4th 511 n.1, 518-19.  *Reyes* also held that class arbitration was not authorized even

18  though "[a]s in *Kinecta*, class actions [were] not listed among the expressly excluded claims."

19  146 Cal. Rptr. 3d at 622.  Indeed, **none** of the arbitration agreements in the California cases listed

20  at page 18 above contained class arbitration waivers.

21       The award's ruling (at 13) that the absence of an explicit class arbitration waiver in the

22  Arbitration Agreement indicates an intention to allow class arbitration is also directly contrary to

23  *Stolt-Nielsen*.  *Stolt-Nielsen* explicitly held that "the differences between bilateral and class-action

24  arbitration are too great for arbitrators to presume, consistent with their limited powers under the

25  FAA, that the parties' mere silence on the issue of class action arbitration constitutes consent to

26  resolve their disputes in class proceedings."  559 U.S. at 687.  The question is not whether the

27  agreement "*preclude*[s] class arbitration," but rather whether the company "*agreed*" to submit to

28  class arbitration.  *Id.* at 684 (italics in original).

1   Recognizing that unequivocal holding, numerous California Court of Appeal decisions

2   have uniformly and explicitly rejected the exact argument relied on by the arbitrator in manifest

3   disregard of the law.  *See, e.g., Rivera*, 2013 WL 6230604, at *5 (rejecting argument that "class

4   arbitration [can be] implied by the fact defendant, who is far more sophisticated, drafted the

5   Agreement and has 'sole responsibility' for that, did not include a specific waiver"); *Arroyo*, 2013

6   WL 4997488, at *5 (rejecting argument that "the fact that an express waiver of class claims was

7   not included in the agreement gives rise to the necessary conclusion that the agreement intended

8   to permit class arbitration"); *Ramos*, 2014 WL 6269307, at *13 (rejecting argument that the

9   absence of class waiver "demonstrates 'an implied agreement to class arbitration exists,'" because

10  "this argument is foreclosed by *Stolt-Nielsen*").

### d.   The Term "Agreement" or "agreement," Cannot Rationally Form a Basis for Concluding that the Parties Intended to Authorize Class Arbitration.

13  Finally, in ruling that the Arbitration Agreement authorizes class arbitration, the award

14  states that the Arbitration Agreement "uses the capitalized Agreement indicating that it intended

15  to apply to disputes covering all customers."  Ex. A at 9.  According to the arbitrator, "[w]hen

16  capitalized it refers to the form of Agreement applicable to all of 23andMe's customers and in

17  lower case it refers to an 'agreement' between a particular individual and 23andMe."  *Id.* at 10.

18  That statement has no foundation or basis whatsoever in the language of the Arbitration

19  Agreement or in the law, and further underscores the fact that the award is not rationally derived

20  from the language of the contract.  A review of the terms of service in which the Arbitration

21  Agreement is contained shows clearly, the capitalized and lower case terms refer -- and can only

22  refer -- to the Terms of Service.  That is the **only** agreement between a claimant and 23andMe.

23  Moreover, a cursory review of the TOS makes clear that "agreement" and "Agreement" refer to

24  the same contract, and that the inconsistent capitalization is due to carelessness.  The arbitrator's

25  attempt to create two agreements on that basis is inexplicable.

26  Furthermore, immediately after using the capitalized word "Agreement," the Arbitration

27  Agreement uses the terms "you" and "your" to refer to a single claimant: "[A]ny disputes with

28  23andMe arising out of or relating to the Agreement ("Disputes") shall be governed by California

24

1    law regardless of **your** country or origin or where **you** access 23andMe . . . .”

2         The irrationality of the award’s conclusion is made evident by Section 27h of the

3    Agreement, also quoted by the Award, which states “If **you** do not want to agree to changes to the

4    **Agreement**, **you** can terminate the **Agreement** at any time…”  (Ex. A at 9.)  Thus, the term

5    Agreement is again surrounded by clearly bilateral language, and cannot **possibly** refer to

6    “disputes covering all customers.”  After all, how could any single customer have the authority to

7    terminate the “Agreement” between 23andMe and all its remaining customers?  The arbitrator’s

8    explanation not only “strains credulity,” but defies all logic whatsoever.

9                    e.    **The Arbitrator’s Quotation Of The Arbitration Agreement**
                          **Underscores The Fatal Defects.**
10

11        The award repeatedly omits important bilateral language immediately following or

12   preceding its selective quotes.  For example, on page 8, the arbitrator cites the following clause in

13   the Arbitration Agreement in an attempt to distinguish it from controlling precedent, pointing out

14   that it contains no bilateral language: “any disputes with 23andMe arising out of or related to the

15   Agreement (Disputes) shall be governed . . .”.  Likewise, to support his construction of the term

16   “Agreement” as referring to “all of 23andMe’s customers,” the arbitrator again selectively quotes

17   a different portion of the same sentence of the Agreement as follows: “Except for any disputes

18   relating to intellectual property rights, . . . any disputes with 23andMe arising or relating to the

19   Agreement (Disputes) shall be . . .” (Ex. A at 9 (underlining in original).)  Yet, the full clause

20   actually continues to read “shall be governed **by California law regardless of your country of**

21   **origin or where you access 23andMe** . . .,” reflecting clear bilateral language in the same

22   sentence, which the arbitrator neglected to quote.

23   IV.    **CONCLUSION**

24        For the foregoing reasons, 23andMe respectfully requests that the Court VACATE the

25   Partial Award regarding clause construction, issued by Arbitrator Robert L. Brent in AAA Case

26   No. 74-20-1400-0032.  Alternatively, Petitioner respectfully requests that the Court stay this

27   proceeding and the arbitration until the Superior Court for the County of San Francisco issues a

28   judicial determination regarding whether the Arbitration Agreement permits class arbitration.

1

Dated: March 20, 2015

Respectfully submitted,
ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3

By: _____ */s/ Robert P. Varian* _____

4

ROBERT P. VARIAN
Attorneys for Petitioner, 23ANDME, INC.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26